UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ESTATE OF GIORA DUVDEVANI
By and through its representative,
Margaret Duvdevani

and

MARGARET DUVDEVANI

and

MICHAEL LOUIS DUVDEVANI

and

DANIEL DUVDEVANI

and

JEREMY DUVDEVANI

and

MOSHE DUVDEVANI

and

HAYA TELLEM

and

OFER ARNIN

Plaintiffs

v.

THE ISLAMIC REPUBLIC OF IRAN
Ministry of Foreign Affairs
Khomeini Avenue
United Nations Street
Tehran, Iran

Civil Action No.

and :

THE SYRIAN ARAB REPUBLIC :
Ministry of Foreign Affairs :
Damascus, Syria :

Defendants. :

## COMPLAINT

1. This action is brought by the Plaintiffs Estate of Giora Duvdevani, Margaret Duvdevani, Michael Louis Duvdevani, Daniel Duvdevani, Jeremy Duvdevani, Moshe Duvdevani, and Haya Tellem (collectively "**Duvdevani Plaintiffs**"); and Ofer Arnin ("**Arnin Plaintiff**"); by and through their counsel, in the individual and/or official capacities of each Plaintiff as more particularly described in the caption and body of this action for their own benefit, and/or for the benefit and on behalf of all those legally entitled to assert a claim under the Foreign Sovereign Immunities Act 28 U.S.C. § 1605A(c) and pursuant to other applicable law. All Plaintiffs, by counsel, bring this action against Defendant **Islamic Republic of Iran** ("Iran") and Defendant **Syrian Arab Republic** ("Syria") jointly and severally.

2. This action arises out of the murders of Ayelet Arnin and Giora Duvdevani committed during the coordinated heinous and murderous terrorist attacks by the Islamic Resistance Movement aka HAMAS ("HAMAS"), a designated Foreign Terrorist Organization, ("FTO") on the NOVA Music Festival and elsewhere in Southern Israel and in Gaza on and since October 7, 2023 ("October 7th Terrorist Attacks").

3. On October 7, 2023, HAMAS carried out the bloodiest terror attack in Israel's history, which is now on record as the deadliest day for the Jewish people since the Holocaust. In addition to murdering approximately 1,200 people, injuring thousands of others, burning and beheading innocent people in their homes and committing acts of mass rapes, HAMAS terrorists

took over 250 people as hostages, almost half of whom -- at the time of this filing – are believed to remain in captivity alive or deceased in Gaza in furtherance of HAMAS's terror activities. Specifically, HAMAS has held out these hostages for ransom, most recently demanding that in exchange for each hostage (or remains of a deceased hostage) that would be released by HAMAS Israel must agree to various terms, including the release of Palestinian prisoners—many of whom have been serving multiple life sentences for committing murder and other violent criminal acts. This murderous conduct, including maiming, hostage taking and ransom demanding strategy has been a prominent feature of HAMAS's terror regime. Indeed Yahya Sinwar, the HAMAS leader widely regarded as the mastermind of the October 7th Terrorist Attacks, was previously released in such an exchange in 2011 after being imprisoned for orchestrating the abduction and killing of two Israeli soldiers and four Palestinians he considered to be collaborators in 1989. In an effort to put an end to the terror, murder, maiming and torture, and to rescue the hostages, Israel has sent into Gaza thousands of currently active and on reserve personnel who in their search through hundreds of miles of underground tunnels and other terrorist strongholds have encountered countless terror attacks and terrorist death traps, which has resulted in the death of hundreds of Israeli security personnel serving in the battle against HAMAS terror.

4. This matter is related to various actions pending or previously filed in this Court including, but not limited to, *Arnin, et al. v. Islamic of Republic of Iran, et al.,* Civil Action No. 24-1819 (RCL) (D.D.C.) ("*Arnin Case I*"), *Arnin, et al. v. Democratic People's Republic of Korea,* Civil Action No. 24-2093 (RCL) (D.D.C.) ("*Arnin Case II*"), *Fuld, et al. v. Islamic of Republic of Iran, et al*., Civil Action No. 20-2444 (RCL) (D.D.C.); *Henkin, et al. v. Islamic Republic of Iran, et al.,* Civil Action no. 18-01273 (RCL) (D.D.C.); *Steinberg, et al. v. Islamic Republic of Iran, et. al.* Civil Action No. 17-1910 (RCL) (D.D.C.); *Baxter, et al. v Islamic Republic of Iran, et al.* Civil

Action No. 11-02133 (RCL) (D.D.C.); and *Roth, et al. v. Islamic Republic of Iran, et al.*, Civil Action No. 11-01377 (RCL) (D.D.C.), and others, in that each of those cases, as does this action, involves Iranian and Syrian sponsorship of the same terrorist organization, HAMAS, which has resulted in the death and injuries of American citizens, each of whom have suffered immeasurable damages recoverable under applicable US and/or applicable State or foreign law.

## JURISDICTION, VENUE, AND CHOICE OF LAW

5. This Court exercises subject matter jurisdiction in accordance with the provisions of 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), and 1605A.

6. Defendant Islamic Republic of Iran has been designated as a State Sponsor of Terrorism by the United States Department of State since 1984 and continues to have been so designated to the present day.

7. Defendant Syrian Arab Republic has been designated as a State Sponsor of Terrorism by the United States Department of State since 1979 and continues to have been so designated to the present day.

8. Defendants Iran and Syria are subject to suit in the courts of the United States pursuant to 28 U.S.C. § 1605A (“FSIA”).

9. Venue lies in this Court pursuant to 28 U.S.C. § 1391(f)(4), which provides, in pertinent part, that a civil action against a foreign State may be brought in the United States District Court for the District of Columbia.

10. Actions for wrongful death, personal injury and related torts perpetrated by foreign state sponsors of terrorism through their officials, employees, and agents within the meaning of 28 U.S.C. § 1605A(c) are unique causes of actions arising out of federal counterterrorism statute(s) and are controlled by applicable federal law.

11. This Court has pendant jurisdiction over various claims of the parties that arise out of applicable DC or Israeli law.

## THE PARTIES

### A. The Plaintiffs

**The Duvdevani Family**

12. Giora Duvdevani was heinously murdered on October 10, 2023 after suffering prolonged and great fear, anxiety and pain as a result of the HAMAS perpetrated October 7th Terrorist Attacks. At the time of the acts alleged, and at all other times relevant hereto, Giora Duvdevani was a citizen of the United States and a victim of "torture" as defined in the TVPA and "personal injury" and "death" as required by 28 U.S.C. § 1605A. Plaintiff Estate of Giora Duvdevani can sue and be sued in this Court.

13. Plaintiff Margaret Duvdevani is the wife of Giora Duvdevani and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Margaret Duvdevani has suffered greatly as a result of the murder of her husband and can sue and be sued in this Court.

14. Plaintiff Michael Louis Duvdevani is the son of Giora Duvdevani and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Michael Louis Duvdevani has suffered greatly as a result of the murder of his father and can sue and be sued in this Court.

15. Plaintiff Daniel Duvdevani is the son of Giora Duvdevani and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Daniel Duvdevani has suffered greatly as a result of the murder of his father and can sue and be sued in this Court.

16. Plaintiff Jeremy Duvdevani is the son of Giora Duvdevani and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Jeremy Duvdevani has suffered greatly as a result of the murder of his father and can sue and be sued in this Court.

17. Plaintiff Moshe Duvdevani is the brother of Giora Duvdevani and has suffered greatly as a result of the murder of his brother. Moshe Duvdevani can sue and be sued in this Court.

18. Plaintiff Haya Tellem is the sister of Giora Duvdevani and has suffered greatly as a result of the murder of her brother. Haya Tellem can sue and be sued in this Court.

**The Arnin Family**

19. Ayelet Arnin was heinously murdered on October 7, 2023 after suffering prolonged and great fear, anxiety and pain as a result of the HAMAS perpetrated in the October 7th Terrorist Attacks upon innocent attendees at the Supernova Music Festival ("NOVA"). At the time of her murder, Ayelet Arnin was a citizen of the United States and a victim of "torture" as defined in the TVPA and "personal injury" and "death" as required by 28 U.S.C. § 1605A.

20. Nimrod Arnin, a renowned producer of the NOVA music festival, was also injured on October 7, 2023 after being attacked and suffering prolonged and great fear, anxiety and pain during the October 7th Terrorist Attacks upon NOVA. Nimrod Arnin is a Plaintiff in the Arnin cases (*Arnin* I and *Arnin* II) I. At the time of his injury, Nimrod Arnin was a citizen of the United States and a victim of "torture" as defined in the TVPA and "personal injury" and "death" as required by 28 U.S.C. § 1605A

21. Plaintiff Ofer Arnin is the brother of both Ayelet Arnin and Nimrod Arnin and has been, at all times relevant hereto, a citizen of the United States. Plaintiff Ofer Arnin has suffered greatly as a result of the murder of his sister and the injuries to his brother. Ofer can sue and be sued in this Court.

**B. The Defendants.**

**The Islamic Republic of Iran**

22. Defendant Islamic Republic of Iran is a foreign state that has been designated and continues to remain designated as a State Sponsor of Terrorism pursuant to § 60 of the Export Administration Act of 1979 (50 U.S.C. App. § 2405) and § 620(A) of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371) at all times since January 19, 1984. Defendant Iran, at all times pertinent to this action, provided and continues to provide material support and resources to HAMAS, in aid and support of its violent terror campaign against individual people, the State of Israel, a member-state of the United Nations, and contrary to the national security interests of the United States.

23. Defendant Iran, through its actions, caused the death and injuries described herein, within the meaning of 28 U.S.C. § 1605A, by providing HAMAS with funding, direction, material support, encouragement, safe haven and/or training for its terrorist activities, including with regard to the October 7th Terror Attacks, during which people were murdered.

24. Defendant Iran is liable for the actions of HAMAS and its agents.

**Syrian Arab Republic**

25. Defendant Syrian Arab Republic is a foreign state that has been designated and continues to remain designated as a State Sponsor of Terrorism pursuant to § 60 of the Export Administration Act of 1979, 50 U.S.C. App. § 2405, and § 620(A) of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371) at all times since December 29, 1979. Defendant Syria, at all times pertinent to this action, provided material support and resources to HAMAS, in aid and support of its violent terror campaign against individual people, the State of Israel, and contrary to the national security interests of the United States.

26. Defendant Syria, through its actions, caused the death and injuries described herein, within the meaning of 28 U.S.C. § 1605A, by providing HAMAS with funding, direction, material

support, encouragement, safe haven and/or training for its terrorist activities including with regard to period leading up to the October 7th Terror Attacks, during which people were murdered.

27. Defendant Syria is liable for the actions of HAMAS and its agents.

**STATEMENT OF FACTS**

28. Several designated Foreign Terrorist Organizations operate in Gaza and on the West Bank of the Jordan River, the most notable of them all of which is HAMAS. HAMAS committed widespread terrorist attacks during the First Intifada (1987 - 1993), the Second Intifada (2000 - 2005), before, during and since its violent takeover of the Gaza Strip in June 2007 following Israel's withdrawal from Gaza in 2005, and its subsequent and continuing terror attacks upon innocent citizens, residents and civilians living in and visitors to the State of Israel. Most recently, on and since October 7, 2023, HAMAS carried out the bloodiest terror attack in Israel's history, which is now on record as the deadliest period for the Jewish people since the Holocaust.

29. HAMAS is the Islamic Resistance Movement and is a radical Islamist terrorist organization that is committed to a violent "Jihad", which means "holy war" against Jewish people and others referred to as infidels.

30. HAMAS is formally committed to the destruction of the State of Israel, a sovereign nation, is extremely anti-American, calls for the death of Jewish people, for death to Israel, death to America, rejects achieving a peaceful resolution of the long conflict between Israel and the Palestinians and is committed to achieving its objectives by violent means, including acts of international terrorism, including unspeakable, barbaric and heinous acts of murder, beheadings, burnings, maiming, rape, hostage-taking and terror committed against Americans, Israelis and others in violation of US law.

31. HAMAS is an acronym for "Harakat Muqawama Islamiyya," which was founded

in December 1987.

32. The HAMAS political documents call for the establishment of an Islamic state throughout and in place of Israel by eliminating the entirety of the State of Israel through violent jihad.

33. HAMAS propaganda since the September 11, 2001 World Trade Center attacks has praised and glorified Osama bin Laden and his supporters engaged in global jihad.

34. Through its military wing, Izz ad-Din al-Qassam Brigades ("Al-Qassam Brigades"), and its various terrorist activities, HAMAS commits criminal activity, including murder, attempted murder, solicitation to commit murder, beheadings, burnings, maiming, rape, hostage-taking, torture and numerous other acts of international terrorism, as defined by 18 U.S.C. § 1331, in violation of the criminal code of the United States.

35. On January 25, 1995, HAMAS was designated as a Specially Designated Terrorist organization and, on October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act as amended by the Antiterrorism and Effective Death Penalty Act of 1996. HAMAS is also designated as a Specially Designated Global Terrorist Organization.

36. HAMAS has also committed kidnapping and hostage taking in order to put pressure on the Israeli and American and other governments, consistent with its terror activities and its total rejection of peace with and the very existence of the sovereign state of Israel.

37. Between 1999 and October 7, 2023, and subsequent thereto, the courts of the United States, including this Court, have rendered a number of decisions and entered numerous judgments finding that HAMAS was responsible for terrorist attacks in which American and Israeli citizens

were killed and/or injured.

38. HAMAS recruits and trains young people in camps, grade schools, high schools and on university campuses to be terrorists and commit single acts of terror including attacks on individual Israelis, Americans and Jews who are living or working or shopping in the towns and villages adjacent to or within the areas of the West Bank of the Jordan River and/or adjacent to the southern border between Gaza and the sovereign state of Israel.

39. During the First Intifada, Second Intifada and continuing until today, HAMAS carried out hundreds of terrorist attacks intentionally injuring and killing American citizens through suicide bombings, shootings, stabbings, rocket attacks, car rammings, and a wide variety of other terror activities. HAMAS not only encourages these attacks, but is proud of the attacks and the attackers, who become celebrated martyrs who directly or through their families receive monies from the Palestinian Authority and/or the Palestine Liberation Organization and/or others as incentives and rewards for having committed acts of murder and other acts of international terror.

## THE OCTOBER 7, 2023 HAMAS TERROR ATTACKS IN ISRAEL

40. On the morning of October 7, 2023, HAMAS committed a well-planned and executed simultaneous wave of coordinated deadly attacks on Israeli civilian communities, Kibbutzim, villages, towns and individuals, including against those attending the Supernova Music Festival in Southern Israel, and against the border crossings and observation buildings and security and posts located within the sovereign state of Israel, slaughtering babies, raping women, burning whole families alive, committing murder, maiming and torture and taking hundreds of innocent civilians and persons to Gaza as hostages. As of the time of this filing, many of the hostages remain in HAMAS captivity, and in attempting to rescue these hostages, hundreds of active or

reservist personnel from the Israeli Defense Forces engaged in fighting HAMAS terror have been killed in additional terror attacks in and around Gaza and elsewhere in Israel.

41. The attacks began in the early morning with a rocket barrage of 3,500-5,000 rockets launched against Israel and vehicle-transported and powered paraglider incursions into its territory. HAMAS terrorists, who had been training and experimenting with planned attacks upon Israel and through the border fence between Gaza and Israel breached the Gaza–Israel barrier, massacring Israeli civilian communities, including but not limited to terror attacks in such communities as Be'eri, Kfar Aza, and at the NOVA music festival, and attacking Israeli security personnel and positions on the border between Israel and Gaza.

42. HAMAS commander Mohammed Deif, in an audio message, announced the start of the October 7th Terrorist Attacks at around 6:30 a.m. Israel Daylight Time on Saturday, October 7, 2023, which it called Operation Al-Aqsa Flood. Deif said the attack was in response to *inter alia* Israel's security measures around Gaza, in West Bank cities, and at the Al-Aqsa Mosque. Shortly thereafter, HAMAS Leader Ismail Haniyeh made a similar announcement in a televised address broadcast from Doha, Qatar, where HAMAS leadership is harbored outside of Gaza and the West Bank.

43. Deif said more than 5,000 rockets had been fired from the Gaza Strip into Israel in a span of 20 minutes at the start of the operation. Israeli sources reported the launch of 3,000 projectiles from Gaza, killing five. Explosions were reported in areas surrounding Gaza and, in the Sharon, Plain, including Gedera, Herzliya, Tel Aviv, and Ashkelon. Air raid sirens were activated in Beer Sheva, Jerusalem, Rehovot, Rishon Lezion, and the Palmachim Airbase. Hamas issued a call to arms, with Deif calling on "Muslims everywhere to launch an attack."

44. Palestinian terrorists also opened fire on Israeli boats off the Gaza Strip, while clashes broke out between Palestinians and the Israel Defense Forces in the eastern section of the Gaza perimeter fence.

45. Simultaneously, approximately 3,000 Palestinian militants infiltrated Israel from Gaza using bulldozers and explosives to puncture several openings across Israel's security barrier on the Gaza border, which were then traversed by HAMAS terrorists operating pickup trucks, and motorcycles. Other HAMAS terrorists entered Israel on speedboats via Zikkim Beach on the Mediterranean Sea, and also by powered paragliders launched to carry them over the border barrier.

46. The Sderot police station was reported to have come under HAMAS control, with terrorists killing 30 Israelis, including policemen and civilians. Early in the attack they deliberately destroyed the computer systems at the police station. This disabled communication and delayed the response to the attacks.

47. Israeli first responders, upon information and belief, recovered documents from killed terrorists' bodies with instructions to attack civilians, including elementary schools and a youth center, to "kill as many people as possible", and to take hostages for use in future negotiations. Some of the terrorists wore body cameras to broadcast and record the acts. Upon information and belief, some terrorists used Captagon during the attacks—a stimulant produced in Syria and used throughout the Middle East. Captagon is provided by terrorist organizations to terrorist jihadist fighters in furtherance of their terrorist activities, as users of the drug report feelings of invincibility, high pain tolerance, and zombielike detachment from emotions and thoughts, such that they will have a thirst for fighting and killing and will shoot at whomever and whatever they see.

48. The morning of the attack, an Israeli defense spokesman said that the terrorists from Gaza had entered Israel through at least seven locations and invaded four small rural Israeli communities, the border city of Sderot, and two IDF security bases from both land and sea. Israeli media reported that seven communities came under HAMAS control, including Nahal Oz, Kfar Aza, Magen, Be'eri, and Sufa. The Erez Crossing was reported to have come under HAMAS control, enabling HAMAS terrorists to enter Israel from Gaza. Israeli Police Commissioner Kobi Shabtai said there were 21 active high-confrontation locations in southern Israel.

49. Other HAMAS terrorists carried out an amphibious landing in Zikkim. Palestinian sources claimed that the local Israeli army security base was stormed. Terrorists also attacked an IDF base outside Nahal Oz, leaving at least 18 dead and taking seven as hostages. An IDF fire investigation found that the terrorists had "ignited substances... that contain toxic gasses which can cause suffocation within minutes, or even less" both at the base and in civilian locations.

50. In this massive surprise and barbaric onslaught, HAMAS terrorists committed unfathomable atrocities, including beheadings, burnings, murder, maiming, torture, widespread rape and sexual violence against women, that have reverberated globally.

51. The October 7th Terror Attacks claimed the lives of approximately 1,200 individuals, with approximately 800 of the bodies confirmed as civilians and including at least 35 U.S. citizens. In addition to those murdered, several thousands of people have been wounded and injured, physically and emotionally. More than 250 people have been taken hostage, including at least 40 children, from reportedly 42 different countries, including the United States. Additionally, some bodies remain unidentified due to substantial mutilation.

52. Since October 7th, approximately one third of the captured hostages are believed to have been killed while in captivity, many of whom were murdered by HAMAS or others acting

in concert with HAMAS in Gaza, 7 hostages have been rescued by the IDF, and 111 hostages were released in negotiations. Over 100 people who were taken hostage by HAMAS or others acting in concert with HAMAS remain unaccounted for in Gaza. Of the hostages who are believed to be dead, many of their bodies are being kept in Gaza, in violation of applicable Jewish religious law requiring immediate decent burial of the dead.

53. Some the heinous and barbaric attacks by HAMAS committed on and since October 7, 2023 include, but are not limited to, the (a) NOVA Music Festival Massacre, (b) Kfar Aza, Kibbutz Be'eri and other Israeli community massacres, (c) Hostage Takings, torture and murders, and (d) attacks upon those fighting HAMAS terror in Gaza:

***Nova Music Festival Massacre***

54. As part of the HAMAS-led attack, 364 civilians were killed and many more wounded at the Supernova Music Festival, an open-air music festival, during the Jewish holiday of Simhat Torah near kibbutz Re'im in southern Israel and within the borders of the sovereign State of Israel. At least 40 hostages were taken from the massacre at the NOVA Music Festival.

55. The details of the hostages' whereabouts and conditions are not publicly known. The massacre at the festival was the largest terror attack in Israel's history and the worst Israeli civilian massacre ever.

***Kfar Aza, Kibbutz Be'eri and other Israeli community massacres***

56. During the HAMAS attack, around 70 HAMAS terrorists attacked Kfar Aza, a kibbutz about 3 kilometers (1.9 mi) from the border with the Gaza Strip, massacring and murdering

residents and abducting several hostages. The kibbutz had more than 700 residents, and it took the IDF two days to wrest back full control of it from HAMAS terrorists.

57. On the morning of the attack, around 70 HAMAS terrorists carried out a massacre at Be'eri, an Israeli kibbutz near the Gaza Strip. At least 130 people were killed in the attack, including women, children, and infants, claiming the lives of 10% of the community's residents. Dozens of homes were also burned down.

58. The US Department of Justice has indicted HAMAS leaders, some of whom are referenced in this Complaint, to wit, Sinwar, Haniyeh and Deif, charging them with various criminal acts relating to and arising from the October 7th Terror Attacks as more particularly described therein and herein.

**IRAN'S SPONSORSHIP OF AND PROVISION OF MATERIAL SUPPORT AND RESOURCES TO HAMAS**

59. The Islamic Republic of Iran has used and continues to use terror as a means of attempting to accomplish its foreign policy and uses terror organizations, such as HAMAS, Hezbollah and other terror organizations as its tools and proxies to commit the terror attacks. This has been determined by the US Department of State, which designated the Islamic Republic of Iran in 1984 as a State Sponsor of Terrorism, a status that has been continuously maintained since that time. Numerous US District Court judgments have been entered against Iran for supporting and sponsoring terror against Americans.

60. The Islamic Republic of Iran is a republic in name only. In reality, it is a theocracy headed by a single cleric holding the title of Supreme Leader who has nearly complete control over the country's policies and actions. Externally, it appears to be a democratic regime with regular elections, but the truth is that the Supreme Leader is a dictator.

61. The constitution gives the Supreme Leader the responsibility to set the general

policies of Iran, including domestic and foreign policies.

62. The Supreme Leader also is commander-in-chief of the armed forces, controls the intelligence and security operations, appoints leaders of the judiciary, state radio, and state television networks, and is supreme commander of the Islamic Revolutionary Guard Corps (IRGC).

63. The Supreme Leader appoints half of the Council of Guardians, the body that oversees the Parliament, ensures laws are in compliance with Sharia (Islamic) Law, and determines which candidates are qualified to run for public office.

64. The Supreme Leader, by and through his independent appointments, effectively controls what laws are passed and who is allowed to run for office.

65. The first Supreme Leader, Ayatollah Ruhollah Khomeini, assumed power in 1979 after a popular uprising. He instituted clerical rule and established the modern Iranian constitution that establishes a Supreme Leader as the real head of the state.

66. Khomeini ruled until his death on June 4, 1989.

67. Seyyed Ali Khamenei was selected by the Assembly of Experts, an 86-cleric assembly, to be the second, and current, Supreme Leader in August 1989.

68. Since his ascension to Supreme Leader, Khamenei has continued and expanded Khomeini's ideology of terrorism as an important tool of foreign policy.

69. The Islamic Republic of Iran supports such Foreign Terrorist Organizations as HAMAS, Hizballah (also spelled Hezbollah), and Palestinian Islamic Jihad. Iran is publicly committed to the destruction and annihilation of the State of Israel, demonizes Israel and the United States of America at the United Nations and in the court of public opinion and supports international terror in a multi-pronged pursuit of its political goals and foreign policy aims that

includes waging a holy war against both Israel and the United States of America. Support for HAMAS from Iran's territory or Iran government actors, on the scale required to facilitate, support, arm, embolden and encourage HAMAS, could not have been accomplished without the explicit authorization of the Iranian government and Iranian Military Intelligence through Supreme Leader Ali Khamenei.

70. Iran has an extensive history of funding and supporting HAMAS terrorism with the goal of murdering, torturing and taking hostage citizens of the United States. A few of those attacks include, but are not limited to, the following cases as decided by this Court:

a. The September 16, 2018, Ari Fuld z'l, an American Jewish citizen, was stabbed and killed in the Gush Etzion junction in Israel, located adjacent to a community where Israelis, Jews and Americans reside, work, shop and live. This Court found Iran liable for funding, aiding, and supporting the HAMAS terrorists in the matter of *Fuld, et al. v. Islamic Republic of Iran, et al*, 873 F. Supp. 2d 232 (D.D.C. 2023).

b. On October 15, 2015, Eitan Henkin z'l, an American Jewish citizen was murdered by a HAMAS terrorist while in his car, with his wife, Naama, who was also murdered, in front of their four children. This Court found Iran responsible for the deaths of the Henkins and liable for the injuries suffered by Eitan Henkin's family. In the matter *of Estate of Judah Henkin v. Islamic Republic of Iran.,* 18-cv-1273 (RCL) 2023 WL 3319425 at *1 (D.D.C. May 9, 2023).

c. The July 20, 2014 killing of Max Steinberg, an American Jewish citizen who had moved to Israel on September 11, 2012 to help in the response to the terror being waged against Israel, and who was serving in the Golani Brigade of the IDF, and pursuant to his commitment to fighting terror went to search for rocket launchers

and terror tunnels in Gaza City, in keeping with his mission to help stop terror. While Max was in Gaza City for this counter-terrorism effort, a member of HAMAS shot at and hit Max's vehicle with an anti-tank rocket. Max was killed by the terrorists' rocket attack. This Court found Iran liable for the death of Max Steinberg and for the injuries to his family. In the matter of *Estate of Steinberg v. Islamic Republic of Iran*, No. 17-CV-1910 (RCL), 2019 WL 6117722, at *1 (D.D.C. Nov. 18, 2019).

d. The Sbarro restaurant bombing on August 9, 2001, in which a HAMAS terrorist detonated a bomb that he carried in a guitar case, killing fifteen people including at least two American citizens, one of whom was Malki Roth z'l, an American Jewish citizen. This Court found Iran liable for the material support and training they provided to the HAMAS terrorist in the matter of *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379 (D.D.C. 2015).

e. This Court found Iran liable for providing logistical and financial support to HAMAS in the matter of *Baxter v. Islamic Republic of Iran*, No. 11-cv-02133 (D.D.C. Sept. 27, 2019). The matter of *Baxter* involved eleven separate terrorist attacks committed by HAMAS during the Second Intifada (2000-2004), which resulted in the death and/or injuries of more than 20 American citizens.

71. The Islamic Republic of Iran was designated by the United States Department of State on January 19, 1984 as a State Sponsor of Terrorism and continues to be so designated to the present day. As such, Iran can be sued in this Court for providing material support to terror organizations which commit acts of international terror against Americans abroad.

72. During the period relevant hereto, Defendant Iran provided HAMAS and its

terrorists with training bases, facilities, funding, and other material support for its terror activities. These training bases and facilities were located outside Tehran, Iran, in Dara Kazwin and elsewhere.

73. HAMAS and its terrorists utilized the training bases and facilities provided by Iran to train for the commission of acts of terrorism. This training included the use of firearms, explosives, knives, and other weapons.

74. HAMAS and its terrorists also utilized these bases and facilities, *inter alia,* as depots for storage of weapons and explosives, to establish, maintain and operate a leadership command, organizational hierarchy and/or operational infrastructure, and/or offices/headquarters.

75. Additionally, at all times relevant hereto, Iran provided HAMAS and its terrorists with funding and training in terrorism activities, including training on the use of weapons and explosives and both strategic and tactical support to attack Americans, Israelis and others living in, working in or visiting the State of Israel.

76. Upon information and belief, the training in terrorism activities was provided by and through Iran military and intelligence officials, and other agents, employees, and officials of Defendant Iran.

77. Upon information and belief, at all times relevant hereto, Defendant Iran also provided HAMAS and its leaders, officials, and terrorists, with lodging, safe haven, and shelter permitting them to conduct their terrorist activities freely and unhindered.

78. During a period that includes at least the last five years, Iran has provided financial and other assistance to HAMAS's terror planning. This has included smuggling weapons from Iran into Gaza. Among other things:

a. Iran has helped HAMAS construct smuggling (and attack) tunnels underneath the

Egyptian and Israeli borders. Iran has hidden long-range rockets on cargo ships carrying food and building supplies. For example, in March 2014, Israel seized a cargo ship headed from Iran to Sudan, for eventual smuggling into Gaza. Among sacks of concrete were long-range rockets (capable of travelling 125 miles and supporting a payload of up to 375 pounds) and 400,000 rounds of ammunition.

b. Iran has placed weapons into sealed barrels and dropped them strategically into currents in the Mediterranean Sea that are calculated to carry the barrels into the waters off Gaza, where HAMAS fighters retrieve the barrels and bring them onshore.

c. Iran has provided training and parts for HAMAS to build weapons inside Gaza.

d. Iran has equipped HAMAS and PIJ with a large and advanced rocket arsenal.

e. Iran has sent generals to Gaza to train HAMAS and PIJ terrorists in the tunnels on how to aim and fire Iranian rockets into Israel.

79. In 2014, HAMAS kidnapped and murdered three Israeli teenagers. This led Israel to engage in several weeks of fighting in Gaza, to which HAMAS responded with relentless rocket fire into Israel. From Iran's point of view, HAMAS has demonstrated an ability to hold Gaza as a base from which to attack Israel. In the aftermath of the 2014 fighting, Iran increased its funding of and military support for HAMAS.

80. Since 2015 and subsequently to this day, HAMAS has launched numerous attacks, supported by Iran, against Americans and Israelis inside Israel.

81. In 2017 to 2018, HAMAS leaders and delegates met with Iranian and Hezbollah officials to discuss increasing Iran's funding and support for HAMAS. This led to Iran becoming the major sponsor of HAMAS, providing $70 to $150 million (or more) each year along with

weapons, munitions, rockets, technology, and other supplies. Iran also provides military training to HAMAS, even smuggling HAMAS terrorists in and out of Gaza for training in Iran and Lebanon.

82. In and since 2018, Iran supported HAMAS in its Great Return March(es), terrorist gatherings along the Israel-Gaza border fence, from which arson terror balloons, kites and launchings of terror devices took place and which have proven to have been practice runs for the October 7th Terror Attacks.

83. In 2019, Iran set up a "war room" in Beirut, Lebanon (where it has substantial sway under the strength of Iran's Hezbollah proxy group). The purpose of the war room was to coordinate among the militant groups that Iran supports to wage its proxy war against Israel. Iranian Quds Force commander Esmail Qaani held meetings in the war room.

84. In 2020, Iran began using cryptocurrency to move millions of dollars to HAMAS.

85. In 2020, the United States sponsored the creation of the Abraham Accords, creating a formal normalization and alliance between the United States, Israel, the United Arab Emirates, Bahrain, and Morocco. Normalization with Sudan was also accomplished, much to the chagrin and opposition of the Islamic Republic of Iran.

86. On May 10, 2021, HAMAS fired long-range rockets at Jerusalem, sparking a round of fighting with Israel. During that relatively short conflict, Iran used the Beirut war room to coordinate with HAMAS and other Iran-backed terror groups that were fighting with Israel. From the war room, the Iranian military directed the flow of weapons from Hezbollah to HAMAS, provided intelligence to HAMAS, and smuggled HAMAS operatives out of Gaza. Iran used the war room to provide HAMAS with aerial and cyber intelligence, including intelligence on the movements of Israeli security forces and other reconnaissance of Israel's defensive positions.

87. Since 2021, Iran has launched a multi-pronged war against Israel and American interests, on the ground, in the air, at sea, through nuclear warhead capability development, in the court of public opinion, on the campuses, and at the United Nations. Iran's leaders specifically threatened and continue to threaten Israel with annihilation; and threatened and continue to threaten America for, *inter alia*, supporting Israel.

**Iran's Role in the October 7th Terrorist Attacks**

88. Since 2021, as potential US sponsorship of Israeli normalization with Saudi Arabia progressed, Iran prepared to reset the regional balance, including by attempting to unite Arab states against Israel and US interests, with a focus on the Palestinian cause.

89. In April to June 2023, Iranian leaders—including Ayatollah Khamenei and then President Raisi—met with HAMAS and PIJ leaders in Iran and Syria to encourage further acts of terrorism against Israel and threats against America.

90. In June 2023, Quds Force commander Esmail Qaani met in Tehran with HAMAS leader Ismail Haniyeh and PIJ leader Ziyad Al-Nakhala.

91. On June 19, 2023, HAMAS leader Ismail Haniyeh met with a delegation of high-level Iranian security and military officials.

92. On June 21, 2023, HAMAS leader Ismail Haniyeh met with the Supreme Leader and effective ruler of Iran, Ayatollah Ali Khamenei.

93. Starting no later than in August 2023, Iranian Quds Force commanders used the Beirut war room to conduct biweekly planning meetings with HAMAS, PIJ, Hezbollah, and other Iranian-backed terror groups. Iran's then foreign minister Hossein Amir-Abdollahian attended at least two of these meetings. Military trainings to prepare for an attack were hosted by Iran.

94. The meetings in the Beirut war room culminated with an October 2, 2023 meeting

in which Iran provided the green light for HAMAS, PIJ, and the other Iran-backed groups to launch the pre-planned attack against Israel, using Iranian intelligence, training, and military supplies.

95. In the early morning of October 7, 2023 HAMAS led the Iranian-backed attack against Israel, killing, kidnapping, and injuring Plaintiffs, among thousands of others.

96. On December 27, Iran's ISNA news agency published a statement by an official spokesperson for Iran's Islamic Revolutionary Guard Corps (IRGC), General Ramezan Sharif, in which Iran took credit for the October 7th Terrorist Attacks as "acts of revenge for the assassination of [Iranian] Quds Force commander Qassem Soleimani by the US and the Zionists (Israelis)."

97. The duration, quantity, and quality Iran's material support, even if not designated for specific attacks, greatly contributed to HAMAS's ability to carry out terrorist attacks. HAMAS and its terrorists could not have carried out the coordinated and continuing lethal attacks described in this Amended Complaint without Iran's support and sponsorship. Iran and its agents knew and intended that HAMAS would continue to carry out further terrorist attacks, and Iran continues to support and encourage HAMAS to this very day.

98. As a direct and proximate result of the provision of the material support to HAMAS by the Defendant Islamic Republic of Iran as described herein, hundreds of innocent people have been killed and grievously injured by acts of terrorism committed by HAMAS. Among the innocent civilians murdered and injured by HAMAS terror on and since October 7thwere Ayelet Arnin and Giora Duvdevani. Ofer Arnin, the brother of Ayelet Arnin and the estate of Giora Duvdevani and his and family members are Plaintiffs named herein. Each American citizens or as otherwise indicated in the within Complaint, and are entitled to justice and an award of damages against the Islamic Republic of Iran for the heinous act of terrorist murder(s) committed upon each decedent and each of the Plaintiffs named herein,

**SYRIA'S SPONSORSHIP OF AND PROVISION OF MATERIAL SUPPORT AND RESOURCES TO HAMAS**

99. The Syrian Arab Republic has used and continues to use terror as a means of attempting to accomplish its foreign policy and uses terror organizations, such as HAMAS, Hezbollah and other terror organizations as its tools and proxies to commit the terror attacks. This has been determined by the US Department of State, which designated the Syrian Arab Republic in 1979 as a State Sponsor of Terrorism, a status that has been continuously maintained since that time. Numerous United States District Court judgments have been entered against Syria for supporting and sponsoring terror against Americans.

100. The Syrian Arab Republic is a republic in name only. In reality, it is a dictatorship and police state that strategically exhibits only the external forms of a democratic regime.

101. Until a February 2012 referendum, its constitution vested one particular party – the Arab Socialist Ba'ath Party –with leadership functions vested in the State and society.

102. Despite the constitutional referendum, the President still has the power to issue laws, and controls the legislative process.

103. The terror-supporting history and understanding of the structure and makeup of the Syrian Arab Republic is relevant to its current support of terror. In 1966, Syrian Ba'athists conducted a coup d'état. The Ba'athists eliminated all political parties in opposition. Hafez Al-Assad was appointed Minister of Defense.

104. In 1970, Hafez Al-Assad led another coup, in which the Ba'ath party was purged of internal opposition, its leaders were jailed, and Hafez Al-Assad was installed as President of the police state.

105. The Al-Assad family controlled the Syrian regime for forty-seven (47) years, since approximately 1970 until December 2024, including during the October 7th Attack.

106. Hafez Al-Assad had a three-decade Presidency, lasting from 1970 to 2000, in which he was confirmed as President in unopposed referenda five consecutive times.

107. He was succeeded by his son Bashar Al-Assad in 2000. Bashar Al-Assad was confirmed as President, leader of the Ba'ath Party and leader of the Army, for a 7-year term, by an unopposed referendum held in 2001 in which he claimed 97.2% of the vote.

108. Bashar Al-Assad was re-appointed in another unopposed referendum in 2007, this time claiming 97.6% of the vote.

109. In 2014, Bashar Al-Assad was reelected to a third 7-year term, claiming 88.7% of the vote with polling only allowed in government-held territory.

110. Members of President Al-Assad's own minority sect, the Al-Awali clan, controlled most key positions in the Syrian military and Syrian intelligence and security services.

111. The Ba'ath Party, controlled by Al-Assad, alsocontrolled the Syrian military, intelligence and security services, the latter consuming a large share of Syria's economic resources.

112. During the relevant time frame, President Al-Assad and his senior aides in the Syrian military and Syrian intelligence and security services made most important decisions in Syrian political and economic life.

113. There are more than a dozen security services in Syria, some overlapping in their domains, to make sure that the whole of Syrian territory is covered. These security services answer directly to President Bashar Al-Assad and his brother General Maher Al-Assad, commander of the Syrian Republican Guard.

114. Syria has been a dictatorship which has been undergoing a civil war during this past decade, emanating from Syria's repression of freedoms within Syria. Following the October 7th Terrorist Attack and amidst the subsequent continuation of terror perpetrated by Syria-sponsored

HAMAS, Assad has left Syria with future governance over the country shrouded in uncertainty and instability.

115. As of the date of the filing of this Complaint, Syria has been and continues to this day in a state of war with its neighbor, the State of Israel, since its founding. Syria is and remains committed to the destruction of the State of Israel and uses the providing of material support for acts of terror as a means of expressing its political opposition to Israel and the United States of America.

116. Syria provides extensive material support for HAMAS as part of its network of terror supporting activities in opposition to Israel and the United States of America.

117. The Syrian Arab Republic was designated by the United States Department of State on December 29, 1979 as a State Sponsor of Terrorism and continues to be so designated to the present day. As such, the Syrian Arab Republic can be sued in this Court for providing material support to terror organizations which commit acts of international terror against Americans abroad.

118. Support for HAMAS from Syrian territory and/or by Syrian government actors, on the scale required to facilitate HAMAS, could not have been accomplished without the explicit authorization of the Syrian government and Syrian Military Intelligence through President Al-Assad.

119. U.S. Department of State Bulletin 87, published in 1987 [Feb. 1987:73] states: "[a]vailable evidence indicates that Syria prefers to support groups whose activities are generally in line with Syrian objectives rather than to select targets or control operations itself. Damascus utilizes these groups to attack or intimidate enemies and opponents and to exert its influence in the region. Yet at the same time, it can disavow knowledge of their operations. Such Syrian-supported groups have carried out scores of attacks against Palestinian and other Arab, Turkish, Israeli, and

Western targets…".

120. The Bulletin lists many examples of Syrian sponsorship of terrorism and terrorist organizations.

121. Syria has an extensive history of funding and supporting HAMAS terrorism with the goal of murdering citizens of the United States and of Israel, as has been previously determined by this Court. A few of those attacks include, but are not limited to:

a. The July 20, 2014, rocket-propelled grenades launched by HAMAS terrorists at an Israeli armored vehicle killing American Max Steinberg and six others who were fighting HAMAS terror and travelling in Gaza City in search of three HAMAS-kidnapped boys, two Israelis and one American. The HAMAS terrorists were materially supported by Syria with financial support, smuggled weapons, and training. This Court found Syria liable for sponsoring and providing materials support to HAMAS. *Estate of Steinberg v. Islamic Republic of Iran*, No. 17-CV-1910 (RCL), 2019 WL 6117722, at *1 (D.D.C. Nov. 18, 2019).

b. The June 12, 2014, kidnapping and murder of three boys, two Israelis and one American, Naftali Fraenkel. The boys were kidnapped by HAMAS terrorists at a junction inside the territory under the control of the State of Israel in Alon Shvut, an Israeli community southwest of Jerusalem, on their way home from school. After eighteen (18) days of intense searching, their bodies were discovered on the property of the head of the HAMAS cell that orchestrated the kidnapping and murders. This Court found Syria liable for sponsoring and providing material support to HAMAS. *Fraenkel v. Islamic Republic of Iran*, 248 F.Supp.3d 21 (D.C.D.C. 2017).

c. The October 22, 2014, vehicular attack by Abdel Rahman Shaludi, a HAMAS terrorist. Abdel drove a car to a light rail station in Jerusalem where he intentionally drove onto the tracks and rammed his vehicle into the crowd of people attempting to kill as many pedestrians as possible. Among the crowd was an American baby, Chaya Zissel Braun, who was in a stroller when it was struck by the car. Chaya was thrown into the air before landing on her head on the pavement; Chaya was pronounced dead two hours later in a nearby hospital. This Court found Syria liable for sponsoring and providing material support to HAMAS. *Braun v. Islamic Republic of Iran, et al.*, 228 F. Supp. 3d 64 (D.D.C. 2017).

d. The October 15, 2015 HAMAS attack on Eitan Henkin who along with his wife, Naama, were both murdered while in the front seat of their car in front of their four children. This Court found Syria responsible for the deaths of the Henkins and liable for the injuries suffered by Eitan Henkin's family. In the matter *of Estate of Judah Henkin v. Islamic Republic of Iran.,* 18-cv-1273 (RCL) 2023 WL 3319425 at *1 (D.D.C. May 9, 2023).

e. The September 16, 2018, HAMAS attack upon Ari Fuld, an American Jewish citizen, who was stabbed and killed in the Gush Etzion junction in Israel, located adjacent to a community where Israelis, Jews and Americans reside, work, shop and live. This Court found Syria liable for funding, aiding, and supporting the HAMAS terrorists in the matter of *Fuld, et al. v. Islamic Republic of Iran, et al*, 873 F. Supp. 2d 232 (D.D.C. 2023).

f. This Court found Iran liable for providing logistical and financial support to HAMAS in the matter of *Baxter v. Islamic Republic of Iran*, No. 11-cv-02133

(D.D.C. Sept. 27, 2019). The matter of *Baxter* involved eleven separate terrorist attacks committed by HAMAS during the Second Intifada (2000-2004), which resulted in the death and/or injuries of more than 20 American citizens.

122. During the period relevant hereto, Defendant Syria provided HAMAS and its terrorists with training bases and facilities and other material support. These training bases and facilities were located within Syria, and in areas of Lebanon including in the Bakaa Valley occupied by and under the complete control of Syria.

123. HAMAS and its terrorists utilized the training bases and facilities provided by Syria to train for the commission of acts of terrorism. This training included the use of firearms, explosives, and other weapons.

124. HAMAS and its terrorists also utilized these bases and facilities, *inter alia,* as depots for storage of weapons and explosives, to establish, maintain and operate a leadership command, organizational hierarchy and/or operational infrastructure, and/or offices/headquarters.

125. Additionally, at all times relevant hereto, Syria provided HAMAS and its terrorists with funding and training in terrorism activities, including training on the use of weapons and explosives.

126. Upon information and belief, at all times relevant herein, the training in terrorism activities was provided by and through Syrian military and intelligence officials, and other agents, employees and officials of Defendant Syria.

127. Upon information and belief, at all times relevant hereto, Defendant Syria also provided HAMAS and its leaders, officials, and terrorists, with additional material support including but not limited to lodging, safe haven, passage and shelter, as well as operational movement of weapons to HAMAS in Gaza and the West Bank, permitting them to conduct their

terrorist activities freely and unhindered.

128. In November 2018, the Treasury Department uncovered a complex "oil-for-terror" network that benefited HAMAS, among others. The scheme involved the shipment of Iranian oil to Syria, which distributed hundreds of millions of U.S. dollars in profits to the IRGC. The IRGC, in turn, sent the funds to Hezbollah and HAMAS. 90. In October 2022, Syria hosted a HAMAS delegation in Syria and publicly reaffirmed its support for HAMAS. Syrian President Bashar al-Assad ("Assad") told the HAMAS delegation that: "despite the war that Syria is being subjected to, it did not change its stance of backing resistance by all forms." Assad announced that as "everyone knew before and after the war," Syria "will not change and will continue as a supporter of resistance."

129. "Resistance" means resisting, rejecting and denigrating the very existence of the sovereign State of Israel.

130. HAMAS chief of Arab relations Khalil al-Hayya told reporters in Damascus that: "This is a glorious and important day, in which we come back to our dear Syria to resume joint work."

131. Syria materially contributed to HAMAS's massive military buildup that preceded the October 7, 2023 Attacks. As reported by *Al Jazeerah* in December 2023, HAMAS leader Ismail Haniyeh told Al Jazeera that part of Hamas's long-range rocket arsenal comes from Syria.

132. On October 7, 2023, the Assad regime issued a statement immediately praising "Operation Al-Aqsa Flood," the name that HAMAS gave to its terror attack of that day. The statement indicated that: "Syria raises its head high in honor of the martyrs of the Palestinian revolution and the heroes who planned and achieved the Al-Aqsa Flood operation."

133. Funding for HAMAS operations has continued to flow from Syria for many years.

The decades of Syria sponsorship of HAMAS has undoubtedly enhanced HAMAS terrorist and military capabilities in the Gaza strip.

134. Syria also provided material support, aided and abetted the October 7th Terrorist Attacks by supplying HAMAS with Captagon, a synthetic amphetamine-type drug.

135. The HAMAS terrorists who perpetrated the October 7th Terrorist Attacks were reportedly found to be under the influence of Captagon. Under information and belief, HAMAS handlers provided Captagon to the invading terrorists because the drug promotes feelings of rage, irritability, and impatience, and encouraged terrorists to murder and torture their victims.

136. Syria produces the vast majority of Captagon, and the Syrian government is reportedly responsible for its production and distribution, including to HAMAS.

137. In November 2023, U.S. Congressman Jared Moskowitz (D-Florida) co-sponsored bipartisan legislation that calls on the U.S. Government to dismantle and disrupt the production and trafficking of Captagon. Representative Moskowitz issued a statement noting that "Captagon is supplied to terrorist organizations across the Middle East by the Assad Regime in Syria," and that he was "horrified to learn that Captagon pills were found on the bodies of dead HAMAS terrorists, allowing them to remain alert and restless as they slaughtered innocent men, women, and babies."

138. Representative Moskowitz added that "This drug not only aided HAMAS in their October 7th Terrorist Attack, but it also funds the terrorist activities of the Assad regime and Hezbollah."

139. The duration, quantity, and quality of Syria's material support, even if not designated for specific attacks, greatly contributed to HAMAS's ability to carry out terrorist attacks. HAMAS could not have carried out the murderous attacks described in this Complaint

without Syria's support and sponsorship. Syria and its agents knew and intended that HAMAS would continue to carry out further terrorist attacks yet continued to support HAMAS.

140. As a direct and proximate result of the provision of the material support to HAMAS by the Defendant Syria as described herein, thousands of innocent people were killed and grievously injured by acts of terrorism committed by HAMAS including but not limited to Ayelet Arnin and Giora Duvdevani e Ofer Arnin, brother of Ayelet Arnin and the Estate of Giora Duvedevani, along with his Plaintiff family members are entitled to justice and an award of damages for the heinous act of terrorist murder committed by HAMAS in the October 7th Terrorist Attacks, in amounts as shall be proven at the trial of the within action.

**COUNT I**
**WRONGFUL DEATH**
**Under 28 U.S.C. §1605A(c) or in the alternative under the laws of the District of Columbia or Israeli Law**

141. Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the foregoing paragraphs as if fully set forth herein.

142. As recounted above, the death of Giora Duvdevani was caused by a willful and deliberate act of terror committed by HAMAS, a Foreign Terrorist Organization, with the material aid and support of the Defendants, the Islamic Republic of Iran and the Syrian Arab Republic, and each of them, who through their agents, financed the attack, planned the attack and/or rendered material support to the activities of HAMAS that resulted in the murder of Giora Duvdevani a US national or otherwise entitled to recover under applicable US and/or State or foreign law. The agents of the Defendants were at all times acting within the scope of their agency and acted on the direction of and/or with the material support of the Defendants, the Islamic Republic of Iran and the Syrian Arab Republic, and each of them, jointly and severally.

143. The attempted kidnapping and/or murder of Giora Duvdevanit was an act of

hostage taking and extrajudicial killing within the meaning of 28 U.S.C. §1605A.

144. At the time of his murder of Giora Duvdevani was a national of the United States within the meaning of 28 U.S.C. §1605A(c)(1).

145. The attempted kidnapping and/or murder of Giora Duvdevani caused his estate, and/or his surviving near family members severe physical and emotional pain and suffering, severe emotional distress and mental anguish, pecuniary loss including loss of income and earning capacity, loss of guidance companionship and society, loss of consortium and solatium, entitling each to Judgment and an award of damages by this Court, to the fullest extent of the law.

146. As a direct and proximate result of the willful, wrongful and intentional act of the Defendants hereinabove described, for which the Defendants are vicariously, jointly and severally liable for acts of terror that include the murdering or killing of Giora Duvdevani committed during acts of international terror, and the Estate of Giora Duvdevani,, is entitled to an award of damages and judgment for his wrongful death against each of the Defendants, jointly and severally, to the fullest extent of the law.

147. WHEREFORE, each of the Plaintiffs demand that judgment be entered, jointly and severally, against the Defendants, The Islamic Republic of Iran and the Syrian Arab Republic, and each of them, for the compensatory damages they suffered, including, but not limited to, pain, suffering, mental anguish, emotional distress, solatium and economic damages in such amounts as shall be proven at trial, and for their costs expended, including attorneys' fees, and otherwise as permitted by applicable law and this Court.

## COUNT II
## SURVIVAL DAMAGES ON BEHALF OF THE ESTATE OF GIORA DUVDEVANI

**Under 28 U.S.C. §1605A(c) or in the alternative the laws of the District of Columbia or Israeli Law**

148. The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

149. The attempted hostage taking and extrajudicial killing of Giora Duvdevani caused by the Defendants actions, caused Giora Duvdevani and his estate severe injury including pain and suffering prior to her death, pecuniary loss and loss of income.

150. From the time the attack began on October 7, 2023 until his death Giora Duvdevani suffered conscious pain and physical and mental anguish. This Plaintiff acted in fear for his life both before, during and after he was mortally wounded.

151. Defendant's conduct was criminal, outrageous, extreme, wanton, willfully malicious and constituting an award of compensatory and punitive damages.

152. WHEREFORE, the Defendants are jointly and severally liable, for the full amount of the decedent's damages in sums as may hereinafter be determined.

**COUNT III**
**SOLATIUM**

**Under 28 U.S.C. §1605 A(c) or, in the alternative, in the laws of the District of Columbia or Israeli Law**

153. The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

154. As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the Defendants, their agents and instrumentalities, which resulted in the deaths to Ayelet Arnin and Giora Duvdevani, and injuries to Nimrod Arnin, each of the Plaintiffs suffered extreme mental anguish, emotional pain and suffering, and the loss of the society and companionship of the victims.

155. Accordingly, each of the Plaintiffs who are close family members of someone that

was injured or killed bring claims for loss of solatium against the Defendants, and each of them, jointly and severally pursuant to 28 U.S.C. § 1605A(c), or, in the alternative, under the laws of the District of Columbia and/or the State of Israel or such other applicable law as the Court may determine.

156. WHEREFORE, each of the Plaintiffs demand that judgment be entered against the Defendant and each of them, jointly and severally, in an amount to be proven at trial for their compensatory damages, and otherwise as permitted by applicable law and this Court.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**Under the Laws of the District of Columbia or Israeli Law**

157. The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

158. On, and subsequent to, October 7, 2023, HAMAS terrorists willfully, violently, and forcefully perpetrated attacks and killed the decedents, Ayelet Arnin and Giora Duvdevani, and injured Nimrod Arnin causing each of the Plaintiffs who are their close family members to suffer extreme mental anguish, emotional pain and suffering, and the loss of the society and companionship of the victims.

159. .

160. The Plaintiffs, each of them suffered severe terror, severe mental anguish, bereavement and grief, witnessed the October 7th Terrorist Attacks.

161. In addition, subsequent to the attacks of October 7th, 2023 the Plaintiffs were exposed to witnessing extreme violence and suffering of their immediate family members but also themselves were targeted during the terrorist attacks.

162. The October 7th Terrorist Attacks constituted extreme and outrageous terrorist

conduct on the part of HAMAS, whose barbaric, heinous and unconscionable acts were funded, directed and materially supported by the Islamic Republic of Iran and the Syrian Arab Republic.

163. As a direct and proximate result of the willful, wrongful, intentional, and reckless barbaric and murderous acts of HAMAS and its terrorists who were funded and directed by the Islamic Republic of Iran and the Syrian Arab Republic, Plaintiffs each and all suffered severe emotional distress, entitling them to an award of compensatory damages.

164. Each Plaintiff may assert a cause of action for intentional infliction of emotional distress against the Defendants in connection with the willful, wrongful, intentional, and reckless actions of HAMAS terrorists. Such cause of action may be asserted pursuant to the laws of the District of Columbia and/or the State of Israel or such other applicable law as the Court may determine.

165. WHEREFORE, Plaintiffs demand that judgment be entered against the Defendants and each of them, jointly and severally, in an amount to be proven at trial for their compensatory damages, and otherwise as permitted by applicable law and this Court.

## COUNT V
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

**Under the laws of the District of Columbia or Israeli Law**

166. The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

167. The attempted hostage taking and murder of Ayelet Arnin and Giora Duvdevani and the injuries suffered by Nimrod Arnin caused each of the Plaintiffs who are their close family members to suffer extreme mental anguish, emotional pain and suffering, and the loss of the society and companionship of the victims. which were foreseeable consequences of providing material support and aid to HAMAS,

168. The actions of the Defendants were willful, extreme, outrageous, and/or grossly negligent and were dangerous to human life and constituted a violation of applicable criminal law and all international standards of civilized human conduct and common decency.

169. As a direct and proximate result of the willful, wrongful, intentional, and reckless barbaric and murderous acts of HAMAS and its terrorists who were funded and directed by the Islamic Republic of Iran and the Syrian Arab Republic, Plaintiffs each and all suffered egregious emotional distress, entitling them to an award of compensatory damages, (except as to Michal Halev, Individually, who seeks damages herein only against the Syrian Arab Republic).

170. WHEREFORE, Plaintiffs demand that judgment be entered against the Defendants and each of them, jointly and severally, (, in an amount to be proven at trial for their compensatory damages, and otherwise as permitted by applicable law and this Court.

## COUNT VI
## CIVIL CONSPIRACY

**Under the Laws of the District of Columbia and/or Israeli Law**

171. The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

172. Defendants knowingly, willfully, and recklessly conspired and agreed and acted in concert with each other and with HAMAS in a common plan and designed to cause an act of coordinated international terrorism, extrajudicial killing, hostage taking and personal injury against, Jews, Israelis, Americans and others in Israel including the attempted kidnapping, murder, hostage taking and injury to the Plaintiffs herein.

173. As such, Defendants are directly, jointly, severally liable for the injuries suffered by the Plaintiffs and therefore, should be held accountable and severally liable for that assault.

174. The Defendant's conduct was criminal, outrageous, extreme, and willfully

malicious.

175. As a direct and proximate result of the willful, wrongful, intentional, and reckless barbaric and murderous acts of HAMAS and its terrorists who were funded and directed by the Islamic Republic of Iran and the Syrian Arab Republic, Plaintiffs each and all suffered severe personal injuries entitling them to an award of compensatory damages.

176. WHEREFORE, Plaintiffs demand that judgment be entered against the Defendants and each of them, jointly and severally, in an amount to be proven at trial for their compensatory damages, and otherwise as permitted by applicable law and this Court.

## COUNT VII
## AIDING AND ABETTING

**Under the Laws of the District of Columbia and/or Israel**

177. The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

178. Defendants provided HAMAS with material support and resources and other substantial aid and assistance in order to aid, abet, facilitate, and cause the commission of acts of international terrorism, extrajudicial killing, torture, hostage taking, personal injury, pain and suffering, including the deaths, and personal injuries to these Plaintiffs.

179. As a result of these acts of international terrorism, extrajudicial killing, torture, hostage taking and personal injury which were caused by resulted from and were facilitated by the Defendants' provision of material support and resources and other acts of aiding and abetting HAMAS, the Plaintiffs suffered damages as enumerated herein.

180. As such, Defendants are directly, jointly, and severally liable for the injuries suffered by the Plaintiffs.

181. Plaintiffs, each and all of them, suffered severe personal injuries entitling them to

an award of compensatory damages.

182. WHEREFORE, Plaintiffs demand that judgment be entered against the Defendants and each of them, jointly and severally, in an amount to be proven at trial for their compensatory damages, and otherwise as permitted by applicable law and this Court.

**COUNT VIII**
**PUNITIVE DAMAGES**

**Under 28 U.S.C. § 1605A(c)**
**(on behalf of all Plaintiffs)**

183. The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

184. The actions of the Islamic Republic of Iran, who has been committing, sponsoring, and supporting acts of international terror against Americans and others at least since 1979, and certainly since 1984 when it was designated as a State Sponsor of Terror; and the actions of the Syrian Arab Republic, who has been committing, sponsoring, and supporting acts of international terror against Americans and others at least since 1979, when it was designated as a State Sponsor of Terror; are heinous in nature, politically motivated, and target the United States of America and the State of Israel, its citizens, residents and visitors, thereby rendering both Defendants, jointly and severally, liable for the heinous attacks upon the Plaintiffs, and thereby entitling each of them to an award of damages as shall be determined at trial and in accordance with the laws of the United States.

185. The acts of the Defendants, and each of them, carried out by their agents as described above, were malicious, willful, unlawful and in wanton disregard of life and the standards of law that govern the actions of civilized nations. The heinous, barbaric, unconscionable murders and killings committed by HAMAS under the sponsorship of the Defendants, and each of

them, has resulted in the loss of life, physical and emotional and solatium injuries and damages as above described and was intended as a result by each Defendant. The family members of the murdered and physically injured Plaintiffs are each victims of the acts of international terror committed by HAMAS with the material support of each of the Defendants. The actions of the HAMAS terrorists who carried out the attack described was within the scope of their agency on behalf of the Defendant. In accordance with the provisions of 28 U.S.C §1605A(c), the Plaintiffs are thereby entitled to a maximal award of punitive damages to the fullest extent of the law.

186. The actions of HAMAS, as set forth hereinabove, were intentional and malicious and in willful, wanton, and reckless disregard of the Plaintiff's rights and physical well-being. The actions of HAMAS were part of its ongoing and continuing campaign of terror committed against citizens of the United States of America and the State of Israel in support of the political and foreign policy goals and aims of HAMAS, of the Islamic Republic of Iran and the Syrian Arab Republic, and each of them, to reject peace with Israel, to oppose US foreign policy in the region, and to use terror as a means of destroying and annihilating the State of Israel, consistent with the foreign policy and genocidal positions of the Defendants, the Islamic Republic of Iran and the Syrian Arab Republic, both of which are avowed enemies of Israel and oppose US foreign policy in the region. The acts of HAMAS were facilitated through funding, training, and material support by the Islamic Republic of Iran and the Syrian Arab Republic. In accordance with 28 U.S.C § 1605A(c) the Defendants, the Islamic Republic of Iran and the Syrian Arab Republic, and each of them, are therefore liable for the actions of HAMAS and its terrorists. In providing such funding, material support, direction, and training, the Islamic Republic of Iran and the Syrian Arab Republic were acting within the scope of its agencies as an instrumentality. Said agencies rendered material support to the terrorists who actually carried out the act of murdering and injuring the Plaintiffs.

This Court has previously found the Defendants liable for the support of HAMAS and other Foreign Terrorist Organizations. Notwithstanding said findings, the Defendants Iran and Syria have continued to this day to sponsor and support terror. The Defendants, and each of them, must be punished by this Court for their continuing acts of sponsorship of terror. The Defendants, and each of them, must be held out as an example to the world that this Court will not countenance acts of terror, nor those who materially support and fund terror. A maximal award of punitive damages is requested on behalf of each and all of the Plaintiffs, as against all Defendants, jointly and severally, in accordance with the provisions of 28 U.S.C. §1605A(c), each of which are liable for punitive damages.

187. WHEREFORE, the Plaintiffs pray that judgment be entered, jointly and severally, against the Islamic Republic of Iran and the Syrian Arab Republic, on behalf of each Plaintiff, in the amount of not less than one billion US Dollars ($1,000,000,000) for the Plaintiffs, as against each of the Defendants, jointly and severally, and their costs herein expended.

**PRAYER FOR RELIEF**

188. WHEREFORE, Plaintiffs, request this Court find each of the Defendants, the Islamic Republic of Iran and the Syrian Arab Republic, liable for the acts alleged herein and enter joint and several Judgment against the Defendant as follows:

a. Awarding each and all Plaintiffs compensatory damages against Defendants Islamic Republic of Iran and the Syrian Arab Republic, jointly and severally, in amounts to which they are entitled by law and as shall be determined at trial in accordance with evidence to be submitted to this Court;

b. Awarding Plaintiffs and each of them solatium damages against the Defendants. Jointly and severally, in amounts to which they are entitled by law and as shall be determined at

trial in accordance with evidence to be submitted to this Court;

c. Awarding Plaintiffs punitive or exemplary damages against Defendants Iran and Syria, in the amount of not less than one billion US dollars ($1,000,000,000) as to each Plaintiff as punishment for their continued support for and sponsorship of acts of terror against Americans, and to send a message to the world that this Court will not countenance the continued sponsorship of terror by the Islamic Republic of Iran and /or the Syrian Arab Republic, in such amounts and consistent with evidence as shall be determined at trial in accordance with evidence to be submitted to this Court;

d. Awarding Plaintiffs prejudgment interest and post judgment interest as computed and calculated at the maximum rate allowable by law;

e. Awarding Plaintiffs their costs and disbursements and reasonable allowances of reasonable fees for Plaintiffs counsel and experts and reimbursement of expenses;

f. Leave to amend this Complaint as the interests of justice may allow; and

g. Granting any and all such further and other relief as the Court may deem just and proper.

Dated: January 7, 2025

Respectfully submitted,

Heideman Nudelman & Kalik, P.C.
5335 Wisconsin Avenue, NW, Suite 440
Washington, DC 20015
(202) 463-1818

By: */s/Richard D. Heideman*______
Richard D. Heideman (DC Bar No. 377462)
Noel J. Nudelman (DC Bar No. 449969)
Tracy Reichman Kalik (DC Bar No. 462055)
Joseph H. Tipograph (DC Bar No. 997533)

Counsel for All Plaintiffs